**Kwan Fai MAK, Petitioner–Appellee–Cross–Appellant,**

**v.**

**James BLODGETT, Superintendent, Washington State Penitentiary at Walla Walla, Respondent–Appellant–Cross–Appellee.**

**Nos. 91–35256, 91–35615.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 24, 1992.

Decided July 16, 1992.

Kathryn Lund Ross, Jones, Ross, Besman & Connolly, Lynnwood, Wash., John Midgley, Evergreen Legal Services, Seattle, Wash., for petitioner-appellee-cross-appellant.

Paul D. Weisser, Asst. Atty. Gen., Olympia, Wash., for respondent-appellant-cross-appellee.

Before BROWNING, TANG, and T.G. NELSON, Circuit Judges.

PER CURIAM:

I

OVERVIEW

Kwan Fai ("Willie") Mak was convicted of murder and aggravated assault and sen-

tenced to death in a Washington court. He subsequently filed this federal habeas corpus petition challenging the constitutionality of both his conviction and his sentence. The district court denied relief with regard to his conviction, but granted the writ with regard to his sentence, finding that Mak had received ineffective assistance of counsel during the penalty phase of his trial.[1] Both sides appealed. We affirm on both appeals. We also conclude additional errors occurred requiring resentencing.

## II

## FACTS

In the early morning hours of February 19, 1983, three young men entered the Wah Mee gambling club in the Chinatown section of Seattle, tied and robbed fourteen patrons and employees of the club, and shot them. Thirteen victims died. Wai Chin survived and became the key prosecution witness.

The King County Prosecuting Attorney filed an information charging petitioner and codefendant Ben Ng with murder and aggravated assault. The third gunman, Tony Ng (no relation to Ben), fled the country.

Ben Ng was tried first and convicted. Mitigating evidence was introduced during the penalty phase of his trial. The jury held the state had not proven beyond a reasonable doubt there were no mitigating circumstances meriting leniency. Ben Ng was therefore sentenced to life in prison without parole.[2]

Mak was tried second and also convicted. Essentially no mitigating evidence was presented during the penalty phase of his trial. The jury found that the state had proven the absence of mitigating factors and therefore sentenced Mak to death.

Tony Ng was captured in Canada after Mak had been tried and sentenced. Canadian authorities permitted extradition only on the condition the state would not seek the death penalty. Tony Ng was convicted and sentenced to seven consecutive life terms.

## III

## PROCEDURAL HISTORY

Mak appealed his conviction and death sentence to the Washington Supreme Court, which affirmed by a 7–2 vote.[3] Mak filed a personal restraint petition, which was also denied by the Washington Supreme Court. Mak then filed a federal habeas petition. The petition was referred to a magistrate. In due course the magistrate recommended denial of all but 3 claims.

The district court held an evidentiary hearing to explore two claims that Mak had received ineffective assistance of counsel during the penalty phase, and inspected certain materials *in camera* to resolve a third claim that the materials should have been revealed pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The district court held Mak had received ineffective assistance of counsel during the sentencing phase because of counsel's failure to introduce significant available mitigating evidence. The court found no *Brady* violation and agreed with the magistrate that Mak's remaining claims were meritless. The court denied relief as to Mak's conviction but granted relief as to sentencing.

## IV

## STANDARD OF REVIEW

The decision whether to grant or deny a petition for habeas corpus is reviewed de

---

**1.** *Mak v. Blodgett,* 754 F.Supp. 1490 (W.D.Wash. 1991).

**2.** Under Washington law, as outlined below, see page 624, if a defendant is found guilty of aggravated first degree murder, the presumptive sentence is life without possibility of parole. This

presumption can be overcome and the death penalty imposed only if the jury unanimously finds no sufficiently mitigating circumstances warranting leniency. Wash.Rev.Code §§ 10.95.-060(4); 10.95.080(1).

**3.** *State v. Mak,* 105 Wash.2d 692, 718 P.2d 407 (1986).

novo. *United States v. Popoola*, 881 F.2d 811, 812 (9th Cir.1989). "To the extent it is necessary to review findings of fact, the clearly erroneous standard applies." *Norris v. Risley*, 878 F.2d 1178, 1180 (9th Cir. 1989). Under the clearly erroneous standard, we must accept the lower court's findings of fact unless we are left with the definite and firm conviction that a mistake has been committed. *Dollar Rent A Car of Washington, Inc. v. Travelers Indemnity Co.*, 774 F.2d 1371, 1374 (9th Cir.1985).

## V

## DISCUSSION

### A. GUILT PHASE ISSUES

Mak raises several issues in his cross-appeal dealing with the guilt phase of his trial: exclusion of evidence implicating a third party in the murder; limitation on cross-examination of two prosecution witnesses; admission of damaging hearsay; newly discovered evidence; prosecutorial misconduct in closing argument; failure to require jury unanimity; and denial of access to *Brady* materials. We affirm the district court's conclusion there was no merit to these claims in a separate, unpublished disposition filed with this opinion.

### B. PENALTY PHASE ISSUES [4]

#### 1. INEFFECTIVE ASSISTANCE OF COUNSEL

*Background*

Mak was represented at trial by court-appointed counsel three and four years out of law school, respectively. Neither had experience in a capital defense, although both had taken felony cases to trial.

Although the case against Mak was filed in February 1983, the attorneys were not appointed until May, when prior counsel withdrew. For the next five months, each attorney devoted nearly ninety hours a week to case preparation, spending most of their time developing evidence that an unindicted individual, one Hing Wong, actually planned the massacre with co-defendant Ben Ng, and that Mak was an unwitting participant.

Defense counsels' strategy at the penalty phase was to present evidence of Hing Wong's involvement that had been excluded during the guilt phase. They assumed this evidence would be admitted in the penalty phase because of the lower evidentiary standard. They were wrong; the trial court not only excluded the evidence, but denied defense counsels' informal request for a recess to permit them to assemble other penalty phase evidence. 754 F.Supp. at 1501. They made no record of the request, and did not preserve an objection. Defense counsel were compelled to commence the sentencing trial essentially unprepared only a few hours after return of the guilty verdict. *Id.* at 1496, 1501.

The only mitigating evidence presented during the sentencing proceeding was expert testimony questioning the reliability of the eyewitness' memory, and a copy of the jury verdict sentencing Ben Ng to life without possibility of parole. Defense counsel failed to present any mitigating evidence regarding Mak's background, family relationships or cultural dislocations that might have affected his behavior. *Id.* at 1501. The district court found there was "substantial and important mitigating evidence readily available," including testimony of family members to show Mak's human qualities, and expert testimony of Dr. Graham Edwin Johnson to show the effects of cultural conflict on young Chinese immigrants. *Id.* at 1496, 1499, 1501.[5] How-

---

4. A number of other issues relating to the penalty phase raised by Mak in his cross-appeal are dealt with in the memorandum disposition: that the prosecutor made improper comments during the penalty phase; that the disparity in the sentences received by Ben Ng and Mak violated Mak's eighth amendment rights; and that penalty phase jury instructions unconstitutionally limited the jury's consideration of mitigating factors and permitted consideration of aggravating factors.

5. Family members would have testified that [Mak] was the beloved youngest son of a traditional Chinese family; that he had been a good student and dutiful son in Hong Kong; that after coming to this country he did well in citizenship, and in some school subjects, for the first few years; that he worked and

ever, Mak's attorneys did not invite Mak's family to testify at trial. *Id.* at 1500. As Mak's mother testified at the district court's evidentiary hearing, "I was never asked [to go to the trial]. If I was asked, I certainly would go. I didn't know. If they had asked, I would go with my husband, for sure, as a couple.... If I had to roll on the floor to go, I would roll on the floor to go." *Id.* at 1497.

The district court noted that defense counsels' failures were understandable because of their inexperience, the limited preparation time available to them after a belated appointment, the intense media focus and their concentration on the guilt phase. However, the court held such failure deprived Mak of his Sixth Amendment right to effective assistance of counsel. *Id.* at 1501.

In *Strickland v. Washington,* 466 U.S. 668, 678, 687, 104 S.Ct. 2052, 2059–60, 2064, 80 L.Ed.2d 674 (1984), a case, like *Mak,* in which petitioner sought reversal of a death penalty conviction based on trial counsel's failure to present certain mitigating evidence during the sentencing proceedings, the Supreme Court established a two-part test to determine when the Constitution requires a criminal judgment be overturned because of ineffective assistance of counsel: (1) *deficiency* of trial counsel's per-

formance, and (2) a showing that the deficient performance *prejudiced* the defense.

*Deficiency of Performance*

■ To prove deficiency of performance, the defendant must show counsel made errors so serious that performance fell below an objective standard of reasonableness under prevailing professional norms. *Id.* at 687–88, 104 S.Ct. at 2064. "Judicial scrutiny of counsel's performance must be highly deferential.... [requiring] that every effort be made to eliminate the distorting effects of hindsight.... and [demanding] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." *Id.* at 689, 104 S.Ct. at 2065. "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)).

In prior Supreme Court and Ninth Circuit cases dealing with failure to admit mitigating evidence where performance has been found reasonable, the attorneys had consciously decided not to present mitigating evidence because of reasonable tactical evaluations—specifically, they determined the evidence would have opened the door to damaging rebuttal evidence.[6]

---

gave money to the family; that he helped his parents in other ways; that he was kind to other members of the extended family; and that he was a "favorite uncle" to young nieces and nephews.
*Id.* at 1496.
The expert testimony of Dr. Johnson would have discussed serious assimilation problems experienced by many Chinese who are moved during adolescence from Hong Kong to North America, and certain values in the Chinese culture of Hong Kong which could help to explain petitioner's involvement in criminal activities here. [The testimony] would also suggest that petitioner's apparent lack of emotion at trial did not necessarily indicate disinterest or coldness, but was consistent with cultural expectations of Chinese males.
*Id.* at 1499.

**6.** *See Strickland,* 466 U.S. at 699, 104 S.Ct. at 2070–71 (decision not to present testimony of family members or psychological evaluations was a reasonable strategic choice because evidence: (1) would have been of little help; (2)

would have opened door to damaging evidence of defendant's criminal history, and (3) was unnecessary because the judge had already heard at plea colloquy the substance of defendant's financial and emotional troubles); *Burger v. Kemp,* 483 U.S. 776, 791–94, 107 S.Ct. 3114, 3124–26, 97 L.Ed.2d 638 (1987) (failure to present any mitigating evidence, including defendant's own testimony or testimony of defendant's mother that he had an exceptionally unhappy and physically abusive childhood, or expert psychological testimony, was reasonable professional judgment because the testimony would have shown defendant's unremorseful attitude, violent tendencies which were at odds with the defense strategy, and his prior criminal acts); *Campbell v. Kincheloe,* 829 F.2d 1453, 1462–63 (9th Cir.1987) (failure to present any mitigating evidence, including that defendant's father was an alcoholic; defendant was the victim of child abuse, suffered from various medical problems as a child, had a history of drug and alcohol abuse, had attempted suicide; and was the father of two children, was reasoned strategic choice because it would have opened

By contrast, in the present case, the district court found Mak's counsel made no such tactical evaluation, and no risk would have been incurred by presenting the proffered evidence. 754 F.Supp. at 1501. The court's finding of fact was sufficiently supported by the record. For example, Mak's attorney testified that he did not make a conscious decision to omit humanizing evidence, and did not feel that such evidence would have opened the door to detrimental rebuttal evidence. *Id.* at 1500. And while both attorneys agreed it was their considered decision to present cultural conflict testimony in the guilt phase through local community members, Robinson testified there was no reason not to have presented both lay and expert witnesses. *Id.*

■ Because of the potential consequences of deficient performance during capital sentencing, we must be sure not to apply a more lenient standard of performance to the sentencing phase than we apply to the guilt phase of trial. As the district court noted, "[t]he issue for the jury is whether the defendant will live or die.... The sentencing hearing is defense counsel's chance to show the jury that the defendant, despite the crime, is worth saving as a human being.... To fail to present important mitigating evidence in the penalty phase—if there is no risk in doing so—can be as devastating as a failure to present proof of innocence in the guilt phase." *Id.* Although counsel's errors were not as egregious as those in some prior cases,[7] we find that Mak's defense counsels' performance fell below an objective standard of reasonableness under prevailing professional norms. Mak's defense counsel never placed Mak in the community nor portrayed Mak as a human being who was a devoted son with family members who loved him. Mak was depicted by the prosecution as a killing machine, and the defense presented no humanizing evidence whatsoever to offset that picture. Absent tactical purpose or risk, such performance is deficient within the meaning of *Strickland.*

### Prejudice to Defense

To meet the prejudice prong of the *Strickland* test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2064. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The reviewing court "must consider the totality of the evidence before the judge or jury." *Id.* at 695, 105 S.Ct. at 2069. In considering the totality of the evidence, the *Strickland* Court adopted a balancing test that weighs the aggravating and mitigating circumstances. The Court stated:

> When a defendant challenges a death sentence ... the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—

the door to evidence that he forcibly raped his ex-wife, repeatedly raped fellow inmates, was involved in drug-and alcohol-induced violence, and was involved in sexually abhorrent conduct with children and animals), *cert. denied,* 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988); *Harris v. Vasquez,* 949 F.2d 1497, 1525 (9th Cir.1990) (failure to present psychiatrists to rebut damaging testimony of the government's psychiatric expert was competent assistance because: (1) a psychiatric defense theory would conflict with his alibi defense, (2) testimony would open the door to equally persuasive psychiatric opinions that reached a different conclusion), *cert. denied,* — U.S. —, 112 S.Ct. 1275, 117 L.Ed.2d 501 (1992).

**7.** *See, e.g., Deutscher v. Whitley,* 884 F.2d 1152, 1159-61 (9th Cir.1989) (defense attorney had knowledge of facts that should have led to investigation of highly mitigating evidence, such as mental health records showing defendant had been diagnosed as schizophrenic with organic brain damage, had been committed to mental hospitals, had sought but not received psychiatric care for uncontrollable outbursts, and family testimony that defendant was regularly beaten by his father and had suffered fetal injury due to a beating his mother received from his father); *Evans v. Lewis,* 855 F.2d 631, 636-37 (9th Cir.1988) (counsel had pre-sentence report referring to defendant's two previous incarcerations in mental institutions (mental impairment was a mitigating factor under state law), but failed to present any mitigating evidence, even though under state law, failure to offset aggravating factors invokes a mandatory death sentence).

would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Id.* at 695, 105 S.Ct. at 2069.

The State, applying the balancing test, argues that Mak was not prejudiced by defense counsels' performance because the guilt phase evidence was overwhelmingly damaging while the proffered mitigating evidence was insubstantial. The State first sets forth the aggravating evidence: the massacre of thirteen innocent individuals; eyewitness testimony that pointed to Mak as the leader; eyewitness testimony that Mak held a gun on helpless victims; the survivor's description of being hog-tied; Mak's testimony that he could easily forgive Ben Ng for an unrelated incident in which Ng shot and killed an innocent jogger; and Mak's testimony that he was not involved in the massacre when the survivor placed him there. The State then attacks the mitigating value of the proffered evidence: evidence that Mak came from a loving family background would have the negative effect of showing there was no comprehensible reason for Mak to have gone astray; testimony of Mak's family members would have shown that they knew little of Mak's criminal life, thereby painting him as a manipulator and a liar; school records showing that Mak received honor roll grades and awards for service and citizenship in junior high school would belie Mak's assertion that he had a difficult time adjusting to life in America; expert cultural conflict testimony might have been unfavorably perceived by the jury as an argument for cultural exemption from the death penalty; and Dr. Johnson's testimony that all immigrant groups faced similar problems might have deflated any theory that Mak was the product of unique cultural circumstances.

Mak responds that the evidence of Mak's loving family, his role as a dutiful son, brother and uncle would have been compelling because the jury would regard Mak as a person of worth if they saw his family standing up for him and knew that he was helpful and kind to them. He argues that Dr. Johnson's cultural conflict testimony would have shown serious assimilation problems experienced by many Chinese who move to the United States during adolescence and might have had the positive effect of explaining that Mak's "stoic" demeanor was consistent with the cultural expectations of Chinese males.

The district court agreed with Mak that there was a reasonable probability that the addition of the evidence would have changed the result. 754 F.Supp. at 1501. The district judge first pointed out that under Washington law, it was the "state's burden to convince every one of the twelve jurors, beyond a reasonable doubt, that there were no 'sufficient mitigating circumstances' to merit life imprisonment without parole rather than death. Wash.Rev.Code § 10.95.060(4). In arguing for the death penalty, the deputy prosecutor relied upon the absence of any proof of positive human qualities in petitioner. He told the jury: 'What separates Willie Mak from the others ... [is] the total absence of fundamental values. There's nothing here to lessen moral culpability.'" *Id.* (original emphasis deleted). The district court then noted that the jury appeared to have accepted this argument, while Ben Ng's jury, which heard mitigation evidence, including the testimony of Ng's mother, opted for life without possibility of parole. The court concluded that it was "impossible to know with certainty whether the mitigating evidence would have changed the outcome, but it very well might have—especially since the death penalty could not be imposed if even one juror was not convinced beyond a reasonable doubt that it should be. There is thus a reasonable probability that, but for the deprivation of counsel's effective assistance at the penalty phase, the result would have been different." *Id.*

■ The State contends that the district court's prejudice analysis was flawed. First, the State argues that the district court erred in considering the effect of the proffered evidence on only one juror rather than the collective jury. In doing so, the State argues, the district court diluted the "reasonable probability" standard by violating the *Strickland* admonishment "not

[to] depend on the idiosyncrasies" of one hypothetical juror. *See Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068. The State concludes that if the speculative sympathies of a potential holdout juror are accorded dispositive weight, the effect would be to lower a convicted defendant's burden.

■ This argument lacks merit for two reasons. First, the State misconstrues the cited portion in *Strickland* which says that in considering what the jury's verdict would have been absent the error, there must be a presumption the decision would have been based on a proper application of the law as opposed to the "idiosyncrasies of the particular decisionmaker, such as unusual propensities toward harshness or leniency." *Id. Strickland* does not stand for the proposition that a court cannot consider the effect of counsel's deficient performance on a single juror, but rather that the court cannot consider the possibility that a juror would render a decision not based on the law, but based on that juror's idiosyncrasies.[8] Second, the effect-on-one-juror approach comports with Washington death penalty law.[9] The law of Washington, upon which *Strickland* presumes each juror has based his or her decision, allows any one juror to set aside the death penalty.

Next, the State contends the district court improperly applied a lower evidentiary standard of proof than the "reasonable probability" standard set forth in *Strickland.* It argues that the "it is impossible to know" and "very well might have" language amounts to the "some conceivable effect" standard expressly rejected by *Strickland. See* 466 U.S. at 693, 104 S.Ct. at 2067. We disagree with the State's reading of the district court's opinion; as we read it, the "might have" language modified only the court's single juror discussion, while the "reasonable probability" language in the following sentence modified the combination of facts upon which the court based its decision. Therefore, the district court properly applied the reasonable probability standard of proof.

■ The State finally argues that, by comparing the life-without-parole result of the Ben Ng trial where the jury heard humanizing evidence at the penalty phase with the death penalty result of the Mak trial where the jury did not have the benefit of humanizing evidence, the district court improperly inserted a proportionality review into the *Strickland* analysis.

Nothing in *Strickland* suggests that a proportionality review is inappropriate when considering prejudicial effect, and the State cites to no case law that supports such a notion.

On the whole, we cannot find fault with the district court's prejudice analysis. Although the present case differs from previous cases in which no prejudice was found, because in this case the proffered evidence would not have opened the door to damaging evidence,[10] it also differs from cases in which prejudice was found because here, the proffered evidence was far less excul-

---

8. The Seventh Circuit upheld the effect-on-one-juror approach in *Kubat v. Thieret,* 867 F.2d 351, 371 (7th Cir.), *cert. denied,* 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989).

9. Wash.Rev.Code § 10.95.060(4) provides:
   Upon conclusion of the evidence and argument at the special sentencing proceeding, the jury shall retire to deliberate upon the following question: "Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?"
   In order to return an affirmative answer to the question posed by this subsection, *the jury must so find unanimously.*
   (emphasis added).

10. *See Strickland,* 466 U.S. at 700, 104 S.Ct. at 2070 (no prejudice in failure to present evidence because the overwhelming aggravating circumstances outweighed the mitigating circumstances and the proffered evidence would have opened the door to harmful and conflicting evidence); *Campbell,* 829 F.2d at 1464 (failure to present mitigating evidence not prejudicial because "given the overwhelming aggravating factors, and, the heinous nature of the crime, there is no reasonable likelihood that the jury's verdict would have been different had the mitigating evidence been introduced," and the mitigating evidence could have opened the door to strong rebuttal evidence).

patory.[11] These cases demonstrate that this case falls somewhere in the middle of a typical *Strickland* prejudice analysis.

■ We do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel affirmance of the district court's grant of habeas corpus as to the sentence of death.[12] *See United States v. Tucker,* 716 F.2d 576, 595 (9th Cir.1983) ("a court may find unfairness—and thus prejudice—from the totality of counsel's errors and omissions"); *Ewing v. Williams,* 596 F.2d 391, 395 (9th Cir.1979) ("prejudice may result from the cumulative impact of multiple deficiencies") (quoting *Cooper v. Fitzharris,* 586 F.2d 1325, 1333 (9th Cir.1978) (*en banc*), *cert. denied,* 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979)).

## 2. EVIDENTIARY ISSUES

■ Mak argues his Eighth and Fourteenth Amendment rights were violated by the refusal of the trial court to admit at the penalty phase circumstantial evidence from which it might be inferred that Mak's co-defendant, Ben Ng, and a third party, Hing Wong, rather than Mak, may have planned the massacre.[13] We conclude the exclusion of this evidence from the penalty phase of Mak's trial was an error of constitutional magnitude.[14]

The trial judge excluded the evidence in the penalty phase as irrelevant. The Washington Supreme Court affirmed on this same ground. *State v. Mak,* 718 P.2d at 424. In dissent, Justice Utter (speaking for himself and one other justice) argued the evidence was relevant because "if believed, [it] tended to decrease appellant Mak's guilt," *id.* at 449 (Utter, J., dissenting), and that since it was relevant it should have been admitted under both Washington and federal law. Justice Utter cited Wash.Rev.Code § 10.95.060[3], which allows admission of all relevant evidence in the penalty phase regardless of its admissibility under the rules of evidence. He also cited *State v. Bartholomew,* 101 Wash.2d 631, 683 P.2d 1079 (1984), in which the court stated that "when a jury is faced with the question whether or not the defendant should be put to death, the defendant should be allowed to submit any evidence of his 'character or record and any of the circumstances of the offense....'" *Id.* at 646, 683 P.2d at 1089 (quoting *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978)). Justice Utter noted that the State justified the fact that Mak was sentenced to death although Ng received a life sentence in part on the ground that Mak was the leader of the massacre. 718 P.2d at 451. Given this rationale, the proffered evidence that Wong planned the massacre and Ng was his agent was obviously central to the sentencing issue. *See id.*

The magistrate below agreed with the majority of the Washington Supreme Court that the trial court acted within its discretion in excluding the evidence as too remote. He read *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), as holding only that the defendant should be allowed to put in any

**11.** *See Deutscher,* 884 F.2d at 1160–61; *Evans,* 855 F.2d at 637–39.

**12.** Mak urges counsel was constitutionally deficient at sentencing in three additional respects. We find these contentions without merit for reasons discussed in the memorandum disposition.

**13.** Mak sought to introduce evidence to the following effect:

A confidential informant told police that Wong was the "main heavyweight" who directed young Hop Sing Tong members like Ben Ng, and that Wong either directed or set in motion the massacre at the Wah Mee.

Hing Wong had a longstanding plan to control gambling in Chinatown and had discussed robbing a gambling club like Wah Mee. Wong was in contact with Ben Ng the day of the massacre and had dinner with Ben that night. Ben Ng's car was seen at Wong's restaurant an hour before the killings. Wong offered to sell Ng a bulletproof vest one week before the incident. Wong was the banker for a business that had gone bankrupt four days before the massacre. Wong had previously asked others to shoot rivals and the shootings had occurred.

**14.** We address Mak's argument that this evidence should have been admitted at the guilt phase in our separate memorandum disposition.

evidence relating to the defendant's character or record or the circumstances of the offense and found that the evidence offered by Mak did not seem to fit into either of these categories.

Mak argues he had a constitutional right to present *all* relevant mitigating evidence related to his character or the circumstances of the offense at the sentencing phase of his trial. We agree. The Supreme Court held in *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), that "the sentencer [may] not be precluded from considering, *as a 'mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *Id.* at 110, 102 S.Ct. at 874 (quoting *Lockett*, 438 U.S. at 604, 98 S.Ct. at 2965) (emphasis in original). "Equally clear is the corollary rule that the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" *Skipper*, 476 U.S. at 4, 106 S.Ct. at 1671 (quoting *Eddings*, 455 U.S. at 114, 102 S.Ct. at 877). The state does not contest this reading of the law. The issue upon which the parties disagree is whether the evidence is relevant.

■ The state argues that federal law does not impose a more lenient standard of relevancy in capital sentencing than the standard imposed by the State's interpretation of its own rules of relevance—that the failure to satisfy the State's rules of relevance renders evidence inadmissible in the penalty phase as well as the guilt phase of a capital trial. This is certainly wrong. The Supreme Court has repeatedly found evidence to be "relevant" to capital sentencing although the State had held it irrelevant under State rules of evidence. In *Skipper*, the Court explicitly rejected the State's argument that evidence of the defendant's future adaptability to prison life was irrelevant. 476 U.S. at 7 & n. 2, 106 S.Ct. at 1872 & n. 2. The Court held the evidence to be "mitigating in the sense that [it] might serve as a basis for a sentence

less than death." *Id.* at 4–5, 106 S.Ct. at 1671 (internal quotations omitted). In *Eddings*, the Court explicitly rejected the State's rule that evidence of the defendant's "violent" background was irrelevant to capital sentencing: "[W]hen the defendant was 16 years old at the time of the offense there can be no doubt that evidence of a turbulent family history, of beatings by a harsh father, and of severe emotional disturbance is particularly relevant." 455 U.S. at 115, 102 S.Ct. at 877.

Whether Mak was the planner of the massacre went to his relative culpability, a factor Washington itself recognizes as relevant in this context. Under Washington law, the jury is instructed that in deciding if leniency is called for, it should consider "[w]hether the defendant was an accomplice to a murder committed by another person where the defendant's participation was relatively minor." Wash.Rev.Code § 10.95.070(4).[15]

Mak also argues that the actions of the prosecutor in painting Mak as the ringleader made the issue of Hing Wong's alleged participation in the massacre relevant, even if it would not otherwise have been. In closing argument, the prosecution said of Mak: "He made the plan and he went out and he carried out the plan, and the job of the defendant was the leader. His job was to oversee everything else that was done by his two crime partners. It was Willie Mak who was in charge. He was not the confused outsider that he would have you believe, but he was the leader of the crime, acting with the motive to commit robbery."

These arguments not only made the issue of Mak's role in the offense relevant, Mak argues, but also gave Mak a due process right to an opportunity to rebut. In *Skipper*, the Court stated:

> Where the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, it is not only the rule of *Lockett* and *Eddings* that requires that the defendant be afforded an opportunity to introduce evidence on this point; it is also the elemen-

---

**15.** Role in the offense is, of course, also considered a relevant factor under the United States Sentencing Guidelines. *See* U.S.S.G. Ch. 3, Pt. B.

tal due process requirement that a defendant not be sentenced to death "on the basis of information which he had no opportunity to deny or explain."

476 U.S. at 5 n. 1, 106 S.Ct. at 1671 n. 1 (quoting *Gardner v. Florida*, 430 U.S. 349, 362, 97 S.Ct. 1197, 1206, 51 L.Ed.2d 393 (1977)).

Under either due process argument, Mak's position is compelling. As Justice Utter noted in dissent in the Washington Supreme Court, "[h]ad the contested evidence been admitted, it could have raised doubts about Mak's alleged autonomy and control in the crime. Because the issue of Mak's control was so central to the penalty proceedings, the evidence of a third party's involvement in the crime was relevant to ... the issue of control...." 718 P.2d at 451.[16]

### 3. ERRONEOUS JURY INSTRUCTIONS

▮▮▮ Mak argues that the court's jury instructions and verdict form erroneously encouraged the jury to reach a unanimous verdict on all issues. Because the death penalty was the only issue that required a unanimous verdict, Mak alleges that this encouragement of unanimity necessarily encouraged jurors to vote for the death penalty and was contrary to law.

When a defendant is found guilty of aggravated first degree murder in Washington state, the presumptive sentence is life without the possibility of release or parole. Wash.Rev.Code § 10.95.030(1). This presumptive sentence can *only* be overcome by a unanimous verdict that "there are not sufficient mitigating circumstances to merit leniency." *Id.* at § 10.95.060(4). At the penalty phase of Mak's trial, *without objection* from defense counsel, the following instructions were submitted to the jury:

Jury instruction number 2 read:

Jurors should consult with one another and deliberate with a view to reaching a unanimous verdict, if it can be done without violence to individual judgment.

Each of you must decide the case for yourself but only after an impartial consideration of the evidence with your fellow jurors. In the course of deliberations, you should not hesitate to re-examine your own views and change your opinion if you are convinced it is erroneous. However, you should not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinions of your fellow jurors, or for the mere purpose of returning a verdict.

Jury instruction 3 read, in pertinent part:

If you unanimously answer "yes," [that you are convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency,] the sentence will be death. If you unanimously answer "no," or if you are unable to agree on a unanimous answer, the sentence will be life imprisonment without parole....

Jury instruction 6 read, in pertinent part:

You must answer one question. All twelve of you must agree before you answer a question "yes" or "no". When all of you have agreed, fill in the answer to the question in the verdict form to express your decision....

The verdict form read:

Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?

*Answer:*

[ ] "YES" (In which case the defendant shall be sentenced to death)

[ ] "NO" (In which case the defendant shall be sentenced to life imprisonment without possibility of parole)

[ ] "UNABLE TO UNANIMOUSLY AGREE" (In which case the defendant shall be sentenced to life imprisonment without possibility of parole)

Challenged instruction number 6 misstated the law by informing the jury that "all

---

**16.** For the same reasons, exculpatory evidence revealed at Tony Ng's trial should be admitted during resentencing.

twelve of the [jurors] must agree" before they could answer "no" to the question whether there were sufficient mitigating circumstances to merit leniency. Challenged instructions number 2, 3 and the verdict form combined to improperly emphasize to the jury that unanimous agreement was required not to impose the death penalty.

The Supreme Court has held that, where the underlying statute does not require unanimity, due process will not tolerate instructions that could reasonably be interpreted by a jury to preclude consideration of any mitigating factor unless such factor was unanimously found to exist. *Mills v. Maryland,* 486 U.S. 367, 384, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384 (1988); *see also Kubat,* 867 F.2d at 373–74; *Kordenbrock v. Scroggy,* 919 F.2d 1091, 1109–10 (6th Cir.1990) (en banc), *cert. denied,* —— U.S. ——, 111 S.Ct. 1608, 113 L.Ed.2d 669 (1991). As in *Mills,* "[u]nless we can rule out the substantial possibility that the jury may have rested its verdict on the 'improper' ground, we must remand for resentencing." 486 U.S. at 377, 108 S.Ct. at 1867.

In *Kubat,* 867 F.2d at 371, the court found prejudice from erroneous instructions that called for a unanimous agreement not to impose the death penalty.[17] The court reasoned:

Whether the jury was completely misled or merely confused would not alter our determination that Kubat was prejudiced. At worst, the jury may have retired for deliberations believing it had to reach a unanimous verdict on sentencing just as it had to do on the merits. At best, it may have entered the jury room confused. *Indeed, even if only one juror had been confused, the reliability of the verdict is undermined. For if that one juror thought that the death penalty should not be imposed he or she might have submitted to the views of the other eleven because of the mistaken belief that unanimity was required.*

*Id.* at 371 (emphasis added).

The state argues *Kubat* is distinguishable because Mak's jury, in contrast with the jury in *Kubat,* was informed that Mak's sentence would be life imprisonment if the jurors did not unanimously agree upon a death verdict. We agree that in this respect the jury instructions and verdict form in *Mak* were not as prejudicial as those in *Kubat.*

We need not decide, however, whether in this case the prejudice would be sufficient in itself to require resentencing. There is no question that challenged instruction number 6 was an erroneous statement of the law. Although such an error might be tolerable were it the only error in the sentencing proceeding, it is nonetheless error which should be corrected at resentencing.[18]

Appeal No. 91–35256, Mak's cross-appeal is AFFIRMED.

Appeal No. 91–35615, the State's appeal of the grant of habeas relief in sentencing, is AFFIRMED and REMANDED for entry of an appropriate order for resentencing in accordance with this opinion.

---

**17.** The instructions which were held to have misstated the law read: Number 6, "If, after your deliberations, you *unanimously* conclude that there is a sufficiently mitigating factor or factors to preclude imposition of the death sentence.... the Court will sentence the defendant to imprisonment." Number 7, "You will be provided with (2) two forms of verdict. When you have *unanimously agreed* upon your verdict you will select the form which reflects your verdict and sign it as I have stated." *Id.* at 369–70 (emphasis added by *Kubat* court).

**18.** Unlike *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), cited by the State, this case involves an erroneous statement of state law.